Your Honor, the second case of the morning called 212-349 Citizens Utility Court v. Illinois Commerce Commission et al. On behalf of the appellant, Ms. Karen Wilson. On behalf of the athlete, Illinois Commerce Commission, Mr. John P. Kelleher. On behalf of the athlete, North Shore Gas, Mr. Theodore T. Dykus. And I understand, Mr. Kelleher and Mr. Dykus, you have made arrangements to split your time. All right, thank you very much. Well, Ms. Wilson, whenever you are prepared. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, my name is Karen Wilson. I'm an Assistant Attorney General with the Illinois Attorney General's Office. And this morning I'm here on behalf of the appellant, people of the state of Illinois, as well as the other appellant, Citizens Utility Board. Your Honors, in this appeal, we ask that the Court reverse the decision of the Illinois Commerce Commission that approved an unorthodox rider mechanism known as Rider VBA, which was designed to guarantee the recovery of revenues and profits from the companies and companies being People's Gas and North Shore Gas's residential and small business customers. This Court's recent decision in 2010 in the case of Commonwealth Edison versus Illinois Commerce Commission laid out and set forth a clear two-pronged test for when riders are permissible under Illinois law. But, I mean, I happen to be one of the panel members in that case and I'm trying to remember it and have tried to remember it. But our concern was that they did not use procedure for a, they called it a rider, and then we told them they had to go back and do something else on Smart Grid. That was an established procedure. This is a new, totally new process, even though they're calling it a rider, because I don't think we know what else to call it. Why isn't this exempt or why won't this create a whole new set of rules, since it is a totally different revenue solution, as it were? Well, Your Honor, it is a rider. It collects money from rate payers. And your test in the two-pronged test that this Court set out in the Commonwealth Edison decision, in which you carefully reviewed all of the relevant Illinois Supreme Court and appellate court law, talked about the recovery of an expense, a particular expense that was imposed on the utility outside of its control. And that cost could be recovered if it fit that category of expense. And it also did not adjust the utility's operating income. It didn't affect the utility's profits. In this instance, we're still recovering revenues. We're recovering money from rate payers. But it doesn't fit that two-pronged test, because it's not an expense imposed on the utility, such as municipal franchise fees or coal-tower cleanup costs or the price of purchased gas, which were specifically identified by both the Supreme Court and Illinois appellate courts in the past as expenses that were passed through items, passed right through to the rate payers without a markup. Here you've got essentially the residential and small business customers' revenue streams on autopilot. And what's important to note is that the utilities and the Commerce Commission say that this is just recovering our fixed costs or our designated revenue requirement. But what's included in those fixed costs is the utility's profit, their authorized profit level. So here it doesn't fit the criteria established in Commonwealth Edison, because riders are designed very specifically to recover particular costs imposed on the utility by an outside entity, such as a government, federal cleanup expense requirements associated with coal-tower cleanup, municipal franchise fees. It just doesn't fit the criteria for permissible riders that this Court talked about and established in the ComEd case. But isn't it very clear in this case, or at least the idea in this case, and whether it works, we'll have to see, that, say, in Smart Grid, they had a rate set up, and then they wanted to impose this to go back and collect these fees. Here, this is the rate for however long – this is how much rate increase you're going to get for however long it takes. You're not going to get any more. You're not going to have any taken away from you. You manage everything within this rate increase that we're going to give you. And that includes these costs that are beyond your control. That's the problem, Your Honor. It isolates this revenue stream without looking at the totality of the utility's revenues and expenses. So traditionally, under rate-of-return regulation, the Commission looks at a 12-month test period and looks at the entire financial picture of the utilities, what's happening, expenses. But they have to do some guessing to do that. They guess. That's right. And some of the guesses taken don't – well, they say, oh, we're going to have a warm winter. Well, maybe we won't. That's right. I mean, maybe winter should have been over today so that we don't have 10 inches of snow tomorrow. Right. But that's probably not going to happen. But they do – here, there's no guessing. You get this amount of money, and you do with it as you have to. And here's why that's inappropriate, Your Honor, because it creates this legal and factual fiction that that revenue requirement established on the date of the order back in January 2012 is the utilities revenue requirement from that point going forward. It isolates those two revenue streams, which includes a profit level, unlike other rider expenses. It includes a profit level. And it says – and it assumes you must recover that level of revenues from just your residential and small business customers, or your financial health will be impaired. So it's based on that factual fiction. And what rate of return regulation talks about in the seminal cases that we cite in our briefs, the Bluefield Water Works U.S. Supreme Court case and the State Public Utilities case versus Springfield Gas, the seminal Illinois case talking about rate of return regulation. And what that case talked about was the notion that the job of regulation is to mimic the competitive marketplace. And what does that mean? That means to set the rates, yes, to recover their costs in a reasonable profit level, but there's no guarantee of profits going forward. And the point of that is to – because this is a monopoly, we need to – in rate of return regulation, these cases talk about the need to incite efficiencies because people's gas and North Shore gas are the only game in town in terms of where a customer can go get natural gas delivery service. So because this is a monopoly, we need to incite efficiencies. So for the commission to assume that those two revenue streams, residential and small business customers' revenue streams, which includes that authorized profit level, must be guaranteed going forward, is isolated a particular cost, in this case fixed costs that included a profit level, and assumed that unless those streams were isolated and recovered and guaranteed that the utility's financial health would be impaired. Well, isn't there some concern as well when they went to this that they can maintain their health and they can maintain their infrastructure, whatever it takes to do what needs to be done to provide this service to – and you keep seeing small businesses, but commercial businesses, that they can be bigger or smaller, and residential. Well, certainly I think the commission's intentions were good. They sought to ensure revenue recovery. However, it ignored, again, the provisions in the Public Utilities Act that protect the utility in those situations where it needs additional revenues. First of all— But they have to come back years later to make up. Here, that isn't necessary. Well, it's important to keep in mind that rate making is perspective. The courts are clear on that, that this is like a legislative function. It's prospective in nature. And you can't look back and see, how did we do? How did the utility do? Did it hit that revenue requirement that we set? That's a prohibition against retroactive rate making under Illinois law. We don't look back. We look forward. And that's, again, the whole point here, that once the utility's rates are set, the utility is set free to go do what it can with that amount of money and hopefully operate efficiently. But the notion that that revenue requirement must be guaranteed month after month after month is a legal fiction that is not supported by the law. Can I ask a question about standard of review? How do you respond to the utility's argument that you misstated the standard of review because unlike the cases you cite, there was no departure here from the usual rules of decision? Well, Your Honor, there was a drastic departure, and I think that's the language that the courts have used. There's a drastic departure from past practice. When they implemented Rider VBA the first time when they created this pilot and then decided in the 2012 order to make it permanent, that was a drastic departure from past practice because no time before has the utility or the Commerce Commission said, let's go back each year and annually true up or reconcile the amount of revenues that the residential and commercial customer classes have supplied to you as a group and see if it matches the revenue requirement we established back in January of 2012. That was a drastic departure from past practice. Substantively it was, but procedurally the Commission followed its own rules, considered the factors that are set out in the statute, correct? No, Your Honor, and here's why. It did not follow its own rules. The rule against single-issue rate making is rooted in the test-year concept, and the test-year concept says, and that's part of the Illinois Administrative Code, 83 Illinois Administrative Code, Parts 285 and 287, and that says that when a utility seeks to adjust its rates, it's required to file 12 months' worth of information, and that's known as the utility's test-year, and they can choose either a historical test-year or a future test-year, and there are certain restrictions as to how far back or how far forward they can go when they lay out that 12 months' worth of data. But that's what the, and the importance of that test-year rule is that when the Commerce Commission is setting rates, we want to make sure they have the entire picture of the utility's finances, and that's very clear in the Commission's own rule, which is rooted in 901 and 202 of the Public Utilities Act, which is the sections of the Act that talk about setting just and reasonable rates. So that has the force of law. It's the Commission's rules reviewed by the Joint Committee on Administrative Rules. It's a regulation that has the effect and force of law. So in our view, it's clear that the Commission violated its own rules, and, in fact, that was, I think, at root in the ComEd decision, too, this notion, again, that you're isolating an expense, in this case what the utilities call their fixed costs for those two customer classes that includes a profit level and not looking at the entire picture of the utility's finances. So, and the courts are clear in the BPI case cited in our brief that when the Commission does depart from past practice, that the usual discretionary review that the courts give the Commerce Commission for their rate-making, that standard is different because they've departed from past practice. And the courts have also said, if I could quote, the risk of single-issue rate-making requires that all riders be closely scrutinized to prevent understatement or overstatement of the revenue requirement. And the ComEd's decision also stated that the reviewing courts must also closely scrutinize all riders to prevent understatement or overstatement of the revenue requirement. And that's the root of our appeal here. We're saying when the Commission made the decision to go back and reconcile, each year, this is, again, a new process. So each year, how did the residential customers do as a group? How did small business commercial customers do as a group compared with the revenue levels that were forecasted in the rate case? That's all new. The usual discretion that the court grants the Commission in the area of setting rates is not present here because of the use of this rider. But the concept's still the same. In the past, we've given them discretion, and we give them broad discretion because they know this, and we don't in a lot of ways. I mean, we have to learn that this is their job day in and day out. And because this is a new procedure, why wouldn't we give them that? I mean, give them that deference. Your Honors, it's important that this process not be continued, that this not be reviewed as a lawful act of the Commission because, again, the purpose of regulation is not to guarantee profits. We want to incite efficiency. That's clear from the seminal cases that we cite in our opening and our reply briefs, Bluefield Waterworks and state public utilities cases. And what those cases, again, if I could quote from the state public utilities, because I think it's particularly relevant here. First, Bluefield says, the principles of rate making are supposed to provide the opportunity, quote, under efficient and economical management for the utility to raise the money necessary for the proper discharge of its public duties. And then also, the courts also indicated that, again, we are to mimic competitive marketplace and that the just and reasonable rate is necessarily a question of sound business judgment rather than one of legal formula and often must be tentative since exact results cannot be foretold. And that's in the state public utility decision at page 218. All right. Illinois is not the only state that's looked at this and actually adopted this. Is that correct? Yes, that's right, Your Honor. And one state apparently has, Ohio has abandoned it for something else at this point. But about how many other states and what were the challenges there generally? When Rider VBA was first approved, approximately 15 states had decoupling riders in effect. And at this point, I believe approximately 20 states have them in place. But I would note, Your Honor, in that at least the majority of the cases, that there is a state statute authorizing or permitting that kind of a true up-run adjustment, a decoupling rider it's called, because it says it decouples sales from revenues. And or there was a settlement involved in a rate case where the utilities and the interveners got together and agreed to decoupling. Even if there was no authority for decoupling? Possibly in some instances, but I think the majority of the states that are doing this have it written as a statute. And Your Honors, in those instances where it wasn't perhaps in the statute, often the settlements involved promises from the utility that if you permit us this decoupling rider, we will invest more in energy efficiency programs. So there was a quid pro quo there. So those circumstances are present here. There's no such offer, even inherent in their request, to be more efficient. And in fact, if I may still continue to talk. Yes. When the commission entered its order in January of 2012, the reasons it cited for approving rider VBA were not tied to energy efficiency, which had been a previous reason when it first approved the pilot. It didn't have anything to do with fears about conservation and declining revenues. The commission identified three reasons. They said it was symmetrical and transparent. And in terms of the symmetry, yes, there's been some refunds, but there were exceptionally cold winters in the beginning of the pilot. And as we know, 2012 was an unusually warm winter, so we don't know what kind of impact that's going to have on rate payers. We believe in the long run, as I mentioned in the beginning, that this was a rider. I mean, it's a fact that this rider was proposed by the utilities for the utilities because they believe it's in their long-run best interest. They didn't do this out of the kindness of their heart because they wanted to possibly give rate payers refunds. And then the second reason that the commission identified was they said that forecasts, on average, are accurate, but clearly aren't perfect going forward. Well, that's always been the case, Your Honor. Every utility has to forecast its revenues when it sets rates. And thirdly, the commission said that this might impact the utility's advantage in terms of the timing of rate cases. The commission talked about the fact that it serves the utility's advantage to be able to say we're going to file a rate case now because if they're earning above their authorized profit level, they can stay back from the commission and not come in for a rate case and earn over their authorized return, as long as no one challenges that. But it's always been within the utility's discretion to come and file a rate case when they believed it was appropriate, and then they present the 12 months' worth of data. That reason, as it turns out, and the commission knew this when it stated that reason, nevertheless, that rationale doesn't hold water because under a new provision of the Illinois Public Utilities Act, Peoples Gas and North Shore Gas are going to be required to come in every two years and file a rate case because they've chosen not to purchase particular synthetic natural gas from a brownfield facility that has yet to be built. Well, that's not all their choice. They have to come back. Right. The choice to where to purchase is theirs, but the fact that they are now required is not their choice, I'm sure. So my point being, Your Honor, that that rationale for justifying right of EBA, that this will somehow be a fairer way to control the rate case filing process, that just doesn't stand up to scrutiny. All right, thank you. You'll have an opportunity for reply. Thank you, Your Honor. Well, I guess that's settled. You're going first. Good morning, Your Honors. May it please the Court, I'm John P. Kelleher. I'm a Special Assistant Attorney General on behalf of the Illinois Commerce Commission. We've tried to split up our argument. There are two main issues as they were raised. The attack on the Commission's order says that it allows for retroactive rate-making, and it also allows for single-issue rate-making in violation of this Court's order in the ComEd case. So I'll be taking about six minutes to talk about the retroactive rate-making argument, and Mr. Aducas will take nine minutes for everything else. The threshold argument is whether they can raise this at all, because it's black-letter law that nobody can raise any kind of issue before a reviewing court that hasn't been raised in their petition for re-hearing under Section 10-113 of the Public Utilities Act. This Court made clear in a case in 1910, Creutzer v. Illinois Commerce Commission, that if an issue is not raised specifically in a petition for re-hearing, it's waived, it's forfeit. It actually is what the Court said. By the way, I wasn't there for that one. I'm sure you would have come up with the same result, though, Your Honor. Because this is just black-letter law. If you don't raise something in your petition for re-hearing, it's either waived or forfeit, and the Court doesn't really have jurisdiction even to consider the issue. They don't say they're candid to their credit. They don't try to say, well, we mentioned it obliquely, or it's assumed in the argument that this is unjust and unreasonable. They say instead that it would have been futile, and they cite the two cases, neither one of which supports the idea that they are absolved from raising issues and preserving them for review because it would be futile to ask for re-hearing. The one case didn't involve re-hearing at all. It involved zoning and whether there had to be a second challenge at the municipal level prior to going to circuit court for a declaratory ruling, and the Court said in that instance, no, you're not barred. You don't have to exhaust your remedies asking for something that's futile before the zoning board. You can go and get a declaratory ruling. The other case actually holds against them. Castaneda interpreted a statute where the agreed party may seek re-hearing before taking an appeal, and the Court said, no, that means they actually must take re-hearing, and the parties to that case said, well, the re-hearing statute said that it's viewed with disfavor. The re-hearing is viewed with disfavor, so it would be futile for us to ask for re-hearing, and the Court rejected that argument and said the fact that there are clear indications that the agency may or will adversely rule against is generally inadequate to avoid the exhaustion requirement. But why wouldn't we want to just resolve this if we can? I don't believe the Court has jurisdiction to do it. I think that it's a jurisdictional requirement. It is certainly a jurisdictional requirement to ask for a hearing. In this Court, you're asking me about jurisdiction, I think. Well, I'm... But there's a case here, I think it's 298-11-3, where the parties were late in asking for a hearing before the commission, and the Court said we don't have jurisdiction to dismiss all the appeals. Well, late is different than filing it on time, but including something that you say wasn't included as it was before the commission. Well, I don't see the difference between saying that if you blow a filing date but you raise all the issues, you're out of luck, but if you timely fail to notify the commission of what you're going to raise... Well, it used to be the case we had to name every single board member who was involved, and lots of cases got dismissed on that basis. We don't do that anymore because it was really form over substance. So is this form over substance or is it truly jurisdictional? I believe it's truly jurisdictional. And I don't know of a case where a court, even if it is not jurisdictional, whether a court has chosen to raise the issue on their own or ignore the fact that there was a failure to raise it. It's always been waived or forfeited, and the court has not. There's no review court that I know of that has decided to go on and review it on their own. Well, assuming we may consider it, do you want to talk to us about the issue? Certainly. There are two aspects of retroactive rate making. One is if the commission somewhere along the line has decided they made a mistake, and rather than just start up a new rate case, they go back and they try to account for the error that was made. The citizens' utility case involved contributed property where, for some period of time, the commission allowed it to be included in the rate base, and there was an income tax effect to allowing depreciation to be taken on this contributed property. Many years later, the commission said, well, that was wrong of us, and tried to take back all the tax breaks that had been generated through this rate treatment by lowering the rate base. And so they did two things. They said, on a going forward basis, we're not going to allow this anymore, but two, we're going to reduce your rate base. And the court said, well, going forward, that's fine. That's not retroactively trying to change or account for your error. But you can't go back and change the rate base. That's retroactive. The other aspects of cases that involve retroactive rate making have been where the commission sets up a situation where it sets base rates, but then says if your actual profit, your actual rate of return in later years is higher, we're going to have a refund situation. That's not going on here. What's going on here is recovering the revenue requirement. And the revenue requirement is the snapshot in time. What your actual results are going to be in a later year, what your actual profits are going to be, what your actual costs are going to be is all different. The complaint from the Attorney General is that they don't want over or under recovery of the revenue requirement. And all that's going on here is there's a formula where the commission sets rates to recover the revenue requirement, nothing more, nothing less. It's not to guarantee profit. It's to recover fixed costs, the revenue requirement. And there is testimony of, I think, utility witness Grace that says these are all fixed costs. That's an evidentiary conclusion that the commission is entitled to make. But doesn't doing this also create that profit or give a greater, not a guarantee, but a greater likelihood that that profit will take place? I think it probably reduces the risk as to whether or not the utility will recover its designed rate of return based on the costs that happen in the future. Because it's ensuring the income stream that was once estimated to allow for this rate of return, there's probably more of a chance it's going to get it, and so there's an adjustment to their cost of capital to indicate that they're a less risky operation. Do you view this as a whole new rate structure or a modification of an existing rate system? I think it's really just a modification. And what it is is the commission is choosing between techniques to recover the revenue requirement, and what the commission said in the order is it would prefer to recover it all in fixed cost charge, right, instead of having some of it volumetrically. There are rate design reasons to have it recovered volumetrically, but the commission could, it would have been within its rights to say we're going to recover it all through the customer charge. And it basically amounts to the same thing because if you recover everything and divide it up by the number of customers, you're going to get pretty much the same revenue stream because the customer base doesn't change very much. You're going to get the same revenue stream as if you're going to go back and true it up for actual revenues received through this rider. So by setting a standard revenue requirement and then deciding how it was going to recover, the commission really hasn't done anything different. It has this rider. It is a different rider. It's not a cost recovery rider. It's a revenue recovery rider. And has Illinois ever done that before? Not to my knowledge, no. But I think the commission has that power because, and I'm getting over my time, the charge to the commission is so broad. It's to come up with just and reasonable rates. And the Supreme Court back in 1919 said, well, that's a rate that gives you the opportunity to pay your bills and make a profit. It doesn't guarantee it, and the commission's not guaranteeing it here because things change. All their expenses are going to go up and down. The capital, the markets are going to be different. What's required of them, what they're charged is going to be different. But they have an opportunity now to recover. And back with the city of Chicago case, the 1302nd, up to that point there were just base rates. But they tried something different because they were having fluctuating cost of gas. And so they said, well, we're going to recover costs in a rider. So now you have base rates and an exact cost recovery. And this is like an evolution of thought as to how to accomplish all the rate-making goals. And so I don't think that this is an evolution. It is going forward. It's not something they've done before, but it's consistent with rate-making principles. Thank you, Counselor. Good morning, Your Honors. May it please the Court, my name is Theodore Idoukis. And I represent Appalachia's North Shore Gas Company and the People's Gas Light and Co. Company. Counsel for the Attorney General and Citizens Utility Board talked about rider VBA being a rider that ensures revenue recovery. Well, I would take issue with that in the sense that what rider VBA does, simply put, is it ensures accurate recovery. Rider VBA is a mechanism that provides more accurate rate design. And that means the manner in which the revenue requirement is established for a utility in a rate case, it provides for a more accurate means of collecting that revenue requirement. Did the utility still have to come in and provide the test year as you would have under other circumstances? Absolutely, Your Honor. The revenue requirement is established, currently was established, would be established in the future, in a rate case based on a test year, looks at what all the operating costs are, plus the return on invested capital, and determines what that revenue requirement is. That's traditional rate-making. All rider VBA does is ensure that the rate design, the way that that revenue requirement is collected on an ongoing basis, makes sure that it doesn't over- or under-recover that revenue requirement. And the reason there's over- or under-recovery is traditionally a significant portion of a utility's revenue requirement is collected through what's been called in the briefs volumetric charges, which means it's a charge per unit of the commodity delivered. Here it's natural gas. Same thing works with electricity. So when we talk about gas, what this means is that in a given year, the amount of revenue collected is going to be based and depend upon, fluctuate based upon, a multitude of variables. Namely, primarily what the record shows is weather. Colder winter, more gas used. Warmer winter, less gas used. But it's also the general economy. It's also based on the aggregate of conservation measures, energy efficiency, more efficient appliances being adopted. The size of your customer base. Are more people moving into your territory? Or are they moving out of your territory? All those factors way outside, well beyond the control of the utility or really anyone, any person, anybody. All those work together to determine what the amount of revenue is that's collected. So after you've looked at a rate case, you've set that revenue requirement based on that test unit snapshot in time. And said this is what cost plus return on investment revenue is. And you try to design a rate to collect that. Well, the way rates have been traditionally designed based on these forecasts of variables that you can't control, you're either historically always going to get over or under recovery. What Rider VBA does, it's again focused on accuracy. And, you know, the counsel for the attorney general mentioned there were some refunds. Well, for the pilot Rider VBA program that was in place, a little bit different than what we have here. But essentially the same concept. You know, the sum refunds was 28 million, as of the time of the record in this case, $28 million over collected through these fluctuating variable factors. That in the absence of Rider VBA, the utility would put in its pocket. And that's why. Well, until somebody challenged it. There is the ability to challenge that outside of a rate case, correct? Well, no, Your Honor, because the money would have been collected by a rate that was approved by the commission in a rate case. So to go back after the fact and say, well, the rate was illegal, improper, or unreasonable in some way, that would be retroactive rate making. It would not be prospective. It would be a look back at until we were wrong in our rate case. Let's fix it. Here, this is part of the mechanism designed to make sure what we design is accurate going forward. And going back to, you know, and that's, again, why, you know, the, when Justice Burkett, you asked about the standard of review and counsel for the attorney general income, you know, pointed you back to the idea of a test year and a revenue requirement created in a test year. You know, putting aside the fact that an argument based on test year rules wasn't raised as part of this appeal, what Rider VBA does is enforce what was done for a test year. It enforces that revenue requirement that was established in a rate case. It tries to true up and make more accurate the recovery mechanism for what a commission does in the rate case. So it really doesn't change the rules. It's not going upside what the commission's done in the past in terms of procedure and its rules. It's looking back and it's actually trying to enforce what traditional rate making looks at, a revenue requirement in a test year. And flowing from that, you know, one of the things that, and counsel for the commission touched on this, you know, one of the things that I want to point out is that what Rider VBA doesn't do, it does not guarantee a return on equity or what's been called profit. What it does guarantee, again, is that there's an over or under recovery of the revenue requirement established in a rate case. Again, if this was about profitability, it wouldn't have been designed to return $28 million to customers. But that was unexpected. That was not anticipated that that would happen. That just happened, correct? Well, what was anticipated was the fact that there would be either over or under recovery. It was expected that it would be either too high or too low. Well, I'm not sure that the amount was or wasn't. I mean, based on history, I think there's nothing, you know, outside the realm of recorded weather that took place in those four years that couldn't have been expected and hasn't happened in the past. But, you know, looking at the traditional rate-making formula of what, you know, revenue requirement equals cost plus return on invested capital. In the traditional rate-making formula, a utility's profit or return on equity, it's not supposed to be tied to how much gas a utility delivers. A utility is not like McDonald's selling Big Macs or Apple selling iPods where their profit motive is based on pushing out more of the product. Their opportunity to recover their return on equity is supposed to be tied to their investments in their capital structure, their distribution system. And the opportunity talked about to earn that return is supposed to be tied to how that utility operates after the rates are set in a rate case. Do they manage their operations efficiently and prudently? Do they keep those actual costs down? Do they become more efficient? Do they keep, in other words, do they keep those actual costs that they incur after the rates are set? Do they keep those in line so that they don't erode or overweigh what that authorized rate of return is on their invested capital? So, vitamin B doesn't disturb that traditional opportunity to make a return on equity. But council said, council for the state said that energy efficiency was not even mentioned when the commission made this decision. It's not technically true. What the commission did in this order was say that energy efficiency was one, it just referred to as one of the factors that plays a part in determining the fluctuation and variability year to year of the amount of gas used. And if you like, I can point you to the page in the record. But, you know, what it didn't do is tie it only to and make a specific tie to energy efficiency. And I would point out that while there wasn't a deal made here to become more energy efficient in exchange for this rider, these utilities are already under a statutory obligation every year to meet efficiency goals. So there's no shirking the policy of becoming more efficient by the utilities. So, so again, just as if there wasn't a rider, the utilities profitability, the return on equity is still being driven by operating their utility efficiently. And just to touch briefly on the single issue rate making argument, rely mostly on our briefs, but just point out again, you know, single issue rate making talks about when you recover costs outside of a test, you're outside of a rate case. You're not looking at all these offsetting factors that the commission looks at in the rate case to determine what for that statute of time that test year, the revenue requirement should be. If you don't look at it like, you know, if you, if you install a more efficient grid, you install newer pipe, you're going to have costs somewhere else to reduce and therefore set those costs. And that's why this course, you know, it struck down the comments market. That's why the first district, you know, address the rider ICR for infrastructure replacement for people's gas and in the Madigan case, that's not what's taking place here. It's not a cost recovery rider. This court's tests in established in the Commonwealth Edison case and really the context of that case. Not that it's really not applicable here. This is really a matter of rate design, how you collect the revenue permit established in a rate case. Now let's collect costs outside of a rate case, which would impact what the revenue part of it should be. It could impact the rate of return. Well, rate design is rate design new for Illinois in some ways. This, would this be a new rate design? Yes. I would say it is. I would say it's new in Illinois. It's innovative. It's trying to look at what some of the problems were in the past and making them better. And, you know, there really shouldn't be a problem with trying to be more accurate. And, you know, for all those reasons and the reasons stated in our brief, we would ask that this court affirm the Congress commission in this matter. Thank you. Ms. Lassen. Thank you, Madam Chair. Very briefly, I'll respond to some of Mr. Idukis' arguments first. Mr. Idukis indicated that this rider ensures, simply ensures, accurate recovery of the revenue requirement. But, again, that's not the regulator's job. Once you set rates, you let the utility go forth and do what it will with the revenue requirement that's been established in the case. And, we want to incite efficiency. So, we don't want to look over the shoulder and take a retrospective look to see how well they've done to see if they've earned that revenue requirement. It's completely antithetical to the notion of rate of return regulation discussed in those landmark cases, state public utilities and Bluefield and Waterworks. Well, without an accurate revenue forecast and this revenue requirement recovery, as it were, and probably I'm using the wrong words, but what happens to the company and what happens to this, you know, the provider? Your Honors, the notion of trying to perfect the forecast of revenues is the problem here. Utilities, that's their job. That's the nature of their business, as we indicated in our prior brief in the first district. That is the expected reality of running a utility business, that you have to forecast demand and usage. So, there's nothing, in that sense, unexpected about the notion that forecasts will vary. And, certainly, in the commission's order, they didn't identify any particular problem with the utility's forecasts. As a matter of fact, I would refer the court to record volume 81 and transcript pages 342 through 351, which is Mr. Cuse's testimony, his cross-examination. Mr. Cuse was the forecasting witness. No one challenged the utility's ability to forecast. The utility didn't come in and say, hey, we're having a problem forecasting revenues here. And, as a result, we're having trouble recovering our fixed costs. It's just the nature of the business. There are uncertainties. And it's not the job of the regulator to look back and try and guarantee the revenue requirement that's been established in a rate case. Well, if there's a better, if there is potentially a better way to do it, and that's essentially, I guess, what the pilot program was designed to do and the commission thought it did that, why can't we use that? Your Honor, I would submit that the way, if the commission wanted to guarantee more revenue recovery, then they could have increased the flat customer charge part of the bill and decreased the amount that's subject to usage variation. When you recover your delivery service, there's a flat charge you pay every month that doesn't vary, and then a certain portion of the costs are recovered through the variable charges, and your bill is impacted by how much you use. So here now, under Rider VBA, we have a situation where customers essentially, if their class as a whole didn't produce the revenues that were forecasted in the rate case, that they're paying for utility service that they didn't use. And I also want to note that I believe your question to Mr. Idukis asked if, under this new rate design, is the test year examined. I believe that was what you were referring to. And perhaps, I don't know if Mr. Idukis misunderstood your question or not, but it's clear. Absolutely, the test year information is not provided each year under this Rider VBA. But it was provided in the hearing where the VBA was first. Yes. Oh, wow. Right. But the notion that that particular dollar value must be continued into the future just does not fit into the concept of rate of return regulation. Again, there's no retrospective look back once a revenue requirement is set. I think that Rider VBA is a solution in need of a problem. Again, utilities come, they present forecasting data. And what they talk about in their forecasting testimony is that they examine trends in energy efficiency. They examine the price of natural gas to see how that impacts demand for natural gas. So if the gas is priced exceptionally high, natural gas, then that might impact customers' usage of that commodity. So they look at that when they forecast. They look at the level of energy efficiency appliances in the saturation of those appliances in the Midwest. And they look at what's happening with the weather. They check in at O'Hare Airport for the last 12 years and try to determine weather trends. All of that is discussed in Mr. Hughes' testimony. And that's the process that's always been used to forecast revenues. And again, the commission didn't identify any problem with that forecast. So that's why I say it's a solution in need of a problem. And also, I would direct the court's attention to record volume 80, transcript pages 82 and 83, wherein the lead witness for the utility indicated that, in fact, revenues for residential customers are not declining and revenues overall for the distribution utility service are not declining. So this was really, Rider VBA is about ensuring profits and revenues. Again, it's a solution in need of a problem. It's unlawful. Very briefly, in response to Mr. Kelleher's arguments on the retroactive rate-making issue, first of all, it is retroactive rate-making because in the BPI-1 case and the Illinois Bell case that we cite, this was very similar circumstance in that the problem with the commission's order in those cases is that they kept looking back to see if the utility had earned more than its authorized rate of return. That was going to be the nature of these new rate orders. The modified regulatory plan in the Illinois Bell case was going to examine return on equities to see if they were excessive. And then in the BPI case, that was a multi-year. The commission established a new multi-year rate-setting order. And because it was new and different, they said, here's what we'll do. Each year we'll check back and see if the utility's over-earned. The court threw that out in the BPI case, saying that that was not within the commission's authority to do that. So this was not, it's not, the commission's argument that our citation to that retroactive rate-making law is inapposite because the commission isn't trying to correct a mistake, that's not a legitimate argument because we're not saying that the commission's trying to correct a mistake. What we're saying is the commission is looking back retroactively to see what's happening with the utility's revenues and profits. Because that revenue requirement, they keep saying, well, we're just ensuring the revenue requirement's set in the rate case. But it's important to remember that that includes the authorized profit level. In all of the cases in Illinois where riders have been permitted, they were passed through expenses, such as franchise fees, the coal-fired cleanup expenses, etc., that didn't involve a markup in profit. They were imposed on the utility and passed through straight to the customer. And in terms of the waiver issue, very briefly, your honors, we did raise it initially when Rider VBA was first approved in 2008. We argued retroactive rate-making principles had been violated. The commission rejected that. In the meantime, this court came down with this decision in comment. It did not address this retroactive rate-making issue because it focused on the single-issue aspect. As a strategy decision in terms of the second case, we focused on the single-issue rate-making aspect. The majority of the commissioners that were present in 2008 were also present in 2012. And in terms of the sense of futility that's talked about in the Herman B. Hillside case, and the notion that your remedy, the exhaustion of remedies was applicable so that the commission could correct its mistake. We believe that the commission was unlikely to correct something that they believed was not a mistake. So we leave that for your judgment as to whether or not we waived that. Again, we think that the key issue here is whether or not you can isolate revenues and assume that the utility's financial health is dependent upon receiving those revenues without looking at what are their expenses, what about revenues from industrial customers? Those aren't examined. So it's not taking the kind of holistic look at a utility's finances that occurs under test year rate-making. And so to adjust rates annually by looking back violates that principle of single-issue rate-making. And thank you for the opportunity to appear today. Thank you. Thank you, counsel, for your arguments. We will take this matter under advisement. We will issue a decision in due course. And we will stand in recess to get ready for our next case.